# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ELIZABETH MORT** and **ALEX RODRIGUEZ**, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 2:10cv1438 |
| | ) | **Electronic Filing** |
| **LAWRENCE COUNTY CHILDREN AND YOUTH SERVICES**; **LAWRENCE COUNTY**; **CHRISSY MONTAGUE**, Lawrence County Children and Youth Services Caseworker; and **JAMESON HEALTH SYSTEM**, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION

Elizabeth Mort ("Mort") and Alex Rodriguez ("Rodriguez") (collectively "plaintiffs") commenced this civil rights action pursuant to 42 U.S.C. § 1983 seeking redress for the alleged unlawful removal of their newborn daughter ("Baby Rodriguez"). Plaintiffs aver that defendants Lawrence County ("the County"), Lawrence County Children and Youth Services ("LCCYS"), and LCCYS caseworker Chrissy Montague ("Montague") (collectively "the County defendants") violated their substantive due process rights under the United States and Pennsylvania constitutions by infringing on the fundamental liberty interest of parents to the custody, care and control of their children. Amended Complaint at ¶ 95. Plaintiffs advance a claim against the County, LCCYS and Jameson Health System ("Jameson") for conspiracy to violate their Fourteenth Amendment rights. Id. at ¶ 101-107. They also aver state law claims against Jameson. Presently before the court are defendants' motions to dismiss on the bases that the complaint fails to state a claim upon which relief can be granted and absolute, statutory and/or

qualified immunity. For the reasons set forth below, the County defendants' motion will be denied and Jameson's motion will be granted in part and denied in part.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "a claim to relief that is plausible on its face." Ashcroft v. Iqbal, – U.S. –, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In contrast, pleading facts that only offer "'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will advancing only factual allegations that are merely consistent with a defendant's liability. Id. Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. Id. at 1949-50; see also Twombly, 550 U.S. at 563 n. 8 (A complaint states a claim where its factual averments sufficiently raise a "'reasonably founded hope that the

[discovery] process will reveal relevant evidence' to support the claim.") (quoting <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 347 (2005) & <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 741 (1975)).

This is not to be understood as imposing a probability standard at the pleading stage. <u>Iqbal</u>, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 235 (3d Cir. 2008) (same). Instead, "[t]he Supreme Court's <u>Twombly</u> formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" <u>Phillips</u>, 515 F.3d at 235; <u>see</u> <u>also</u> <u>Wilkerson v. New Media Technology Charter School Inc.</u>, 522 F.3d 315, 321 (3d Cir. 2008) ("The complaint must state 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'") (quoting <u>Phillips</u>, 515 F.3d at 235) (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." <u>Twombly</u>, 550 U.S. at 563.

Mort gave birth to a healthy baby girl on April 27, 2010, at Jameson Hospital's North Campus. Am. Compl. at ¶ 31. During her pregnancy Mort had received "necessary and appropriate medical care" and did not use any illegal drugs. <u>Id</u>. at ¶¶ 32-33.

On April 26, 2010, at approximately 3:00 p.m., Mort consumed an "everything" bagel from Dunkin Donuts, which, among other things, contained poppy seeds. <u>Id</u>. at ¶ 34. Two hours later she was admitted to Jameson's North Campus in labor. Shortly after being admitted she voluntarily submitted a urine sample in accordance with Jameson's policy. <u>Id</u>. at ¶¶ 35-36.

The initial result of Mort's urine drug screen ("UDS") was positive for opiates with a concentration of opiate metabolites at a level of 501 nanograms/mL, which is above the 300 nanograms/mL "cut-off" established by Jameson's policy.  Id. at  ¶¶ 38, 42.  A test result of 501 nanograms/mL of opiate metabolites is 1499 nanograms/mL below the 2000 nanograms/mL cut-off level used in federal workplace testing to avoid "false positives" caused by consuming common foods and medicines.  Id. at 22.  At this point, Jameson did not notify Mort that her UDS was positive for opiates.  Jameson did, however, notify Mort's obstetrician, Nicole Carlson, M.D. ("Dr. Carlson").  Id. at  ¶¶ 39-40.

Dr. Carlson did not inform Mort of the positive test result because (1) throughout her pregnancy Mort's urine tests were negative for the presence of drugs, (2) she did not believe Mort was a drug user and (3) she did not want to "frighten" Mort during the labor and delivery process.  Id. at ¶ 41.  In addition, Dr. Carlson was well aware from her prior experience that "many of the initial UDS tests come back as 'false positives.'"  Id. at ¶40.

Under Jameson's policy a second test is conducted on the same urine sample when the initial UDS is positive.  Id. at 42.  Mort's confirmatory test also was positive for the presence of opiate metabolites at a level of 501 nanograms/mL.  Id.  Neither Mort nor Dr. Carlson were made aware that the confirmatory test yielded a positive result.

Jameson's policy also requires the testing of the baby.  Baby Rodriguez's drug test was negative.  Id. at ¶ 48.  Baby Rodriguez did not exhibit any signs or symptoms suggesting she had been exposed to drugs while in the womb.  Id. at 49.

Jameson did not ask Mort if she had eaten any foods that could affect the test results, nor did anyone at Jameson advise her that the ingestion of certain foods, like poppy seeds, could impact the results of her UDS.  Id. at ¶ 37.  No one from Jameson's social services department

visited Mort and/or Rodriguez, questioned them about drug use or inquired about their ability to care for their child. Id. at ¶¶ 51-52.

Mort and Baby Rodriguez were discharged on April 29, 2010. Plaintiffs were not informed of Mort's positive UDS. They returned to their home with Baby Rodriguez. Id. at ¶¶ 51-53.

Pursuant to its policy, Jameson notified LCCYS of the positive UDS results. Id. at ¶¶ 45, 102. Jameson did not inform LCCYS that (1) throughout Mort's prenatal care there was no indication that she had used drugs; (2) Dr. Carlson had no basis to believe and did not suspect that Mort had used drugs during her pregnancy; (3) the positive test result was based on an extremely low level that was consistent with and could have been caused by the consumption of certain foods, such as poppy seeds; (4) Baby Rodriguez had tested negative and did not exhibit any symptoms that would suggest prenatal exposure to drugs; and (5) Jameson's treating staff had no reason beyond the positive test results to believe that Mort had used drugs at any time or that Baby Rodriguez was or had been a victim of drug and/or child abuse. Id. at ¶¶ 37-38, 41, 49-50, 58. LCCYS and/or Montague did not ask about any of these matters/areas. Id. at ¶¶ 52, 55-58. Nor did Montague or anyone else from LCCYS ask about the levels of the opiates detected in Mort's UDS. Id. at ¶ 46

On April 30, 2010, Montague orally petitioned the Juvenile Division of the Lawrence County Court of Common Pleas for an *ex parte* order permitting LCCYS to take Baby Rodriguez into emergency protective custody. The petition was based solely on Jameson's report of Mort's positive UDS and alleged that based on the positive test result Baby Rodriguez was without proper parental care and needed to be taken out of the home due to exposure to drugs. Id. at ¶¶ 54-55. Based upon Montague's allegations, the court immediately issued the *ex parte* order.

Thereafter, two LCCYS caseworkers and two Neshannock Township Police Department officers arrived at Mort and Rodriguez's residence at approximately 3:00 p.m. Id. at ¶¶ 60-61.

Plaintiffs were presented with the order authorizing the removal of Baby Rodriguez from their custody and her placement into foster care. Upon inquiry, they learned of Mort's positive UDS. Id. at ¶¶ 62-63. The caseworkers and police officers were at the home for fifteen minutes. They did not, however, inspect the home or interview plaintiffs. Id. at ¶ 66. The caseworkers took Baby Rodriguez into protective custody and refused to tell plaintiffs where they were taking her. Id. at ¶ 67.

Mort's father, Richard Mort ("Mr. Mort"), left work and returned to plaintiffs' residence, where he also lived, upon learning that LCCYS had taken his granddaughter into custody. Id. at ¶ 69. He contacted LCCYS and was told to contact an attorney, which he did. Id. at ¶ 70. After being informed about the positive UDS and becoming more informed about potential causes and his daughter's activities on the day she went into labor, Mr. Mort suspected that the positive UDS was the result of her ingesting the poppy seeds on the "everything bagel." Id. at ¶ 72. Mort then contacted Dr. Carlson and asked her to order another UDS. Two hours after the removal of Baby Rodriguez Mort went to Jameson North Campus and provided a urine sample. Id. at ¶¶ 73-74.

An informal hearing was scheduled at 1:30 p.m. on May 3, 2010, to determine whether Baby Rodriguez's placement in shelter care was necessary. Plaintiffs and Mr. Mort as well as their appointed lawyers arrived at the scheduled time. Id. at ¶¶ 75-76. Rodriguez asked his lawyer if he could take custody of Baby Rodriguez. Rodriguez was told that he would need to live apart from Mort and undergo drug testing in order to obtain custody. Id. at ¶ 77.

Mort and Mr. Mort met with Mort's court-appointed lawyer. They informed him of the poppy seeds Mort had ingested two hours before going into labor and the ability of poppy seeds

to produce positive test results for opiates.  Id. at ¶ 78.  The lawyer then arranged for them to meet with Montague.  Mort and Mr. Mort then informed Montague about the low cut-off levels used by Jameson and their belief that the initial UDS was a false positive due to eating poppy seeds.  Montague "appeared to believe" that it was a false positive and admitted that LCCYS "had experienced problems with Jameson in the past and that LCCYS had made a mistake by removing Baby Rodriguez from Plaintiff's custody."  Id. at ¶ 80.  At that point plaintiffs believed that LCCYS would not contest the return of Baby Rodriguez at the informal hearing and that she would be returned to them later that day.  Id. at ¶ 81.  For reasons unknown to plaintiffs Juvenile Court Master Susan Papa refused to hold the informal hearing that day and rescheduled it for May 6, 2010.  Id. at ¶ 82.

On May 4, 2010, LCCYS permitted plaintiffs to visit Baby Rodriguez in LCCYS's office. This was the first time they were able to see Baby Rodriguez since she had been taken four days earlier.  Id. at ¶ 84.  During the visit they learned that the UDS Mort submitted on April 30, 2010, was negative and they informed Montague of the result.  Although Montague again appeared to believe plaintiffs' assertion that the original positive result was due to the poppy-seed bagel and acknowledged the subsequent negative test result, LCCYS did not permit plaintiffs to take Baby Rodriguez home.  Id. at ¶ 85.

On May 5, 2010, LCCYS informed plaintiffs that it intended to file a motion to dismiss the dependency petition and that Baby Rodriguez would be returned to their custody.  Id. at ¶ 86. Montague brought Baby Rodriguez to their home at approximately 1:00 p.m.  Id.

On May 6, 2010, LCCYS filed the motion to dismiss, stating therein that "[a]fter further investigation, there is no evidence to support illegal drug use by the natural mother, Elizabeth Mort."  Id. at ¶ 87.  On May 10, 2010, the court granted the motion.  Id. at ¶ 88.

Plaintiffs assert four claims against defendants in their Amended Complaint. At Count I, plaintiffs allege that the County, LCCYS, and Montague violated their parental rights to the care, custody, and control of their child by taking action pursuant to LCCYS's custom, policy, or practice under which they "seek to remove newborn children from their parents based solely upon a report from a hospital or other medical professional of a positive prenatal drug test of the child's mother, and without any further investigation into family circumstances whatsoever." Id. at ¶ 95.

At Count II, plaintiffs allege that Jameson, LCCYS, and the County entered into a "combination, agreement, or understanding to violate Plaintiffs' constitutional rights under the Fourteenth Amendment by carrying out, through Jameson, a policy of testing all obstetrical parents, which resulted in the removal of Plaintiffs' child from their custody without reasonable suspicion that she had been abused or was in imminent danger of abuse." Id. at ¶ 101.

Finally, at Count III Mort claims that Jameson was negligent and breached its duty of care by setting arbitrary and unreliably low cut-off testing levels without scientific or medical bases for doing so; failing to account for the consumption of certain foods in setting cut-off levels; failing to account for and establish measures to rule out causes that could produce false positives; failing to use due care in interpreting and reporting the results of Mort's UDS; reporting Mort's UDS as proof that she had abused opiates; and failing to inform Mort of the positive UDS and interact with her to ascertain whether drug consumption or other potential causes were responsible for the positive test results.[1] Id. at ¶ 112.

---

[1] Plaintiffs' amended complaint also alleges at Count IV that Jameson placed Mort in a false light by reporting Mort's drug test results as positive for opiates. Id. at ¶ 116. Plaintiffs concede that this count should be dismissed without prejudice.

The County defendants contend plaintiffs' amended complaint must be dismissed because Montague presented reliable information to a judicial officer and obtained an order authorizing the removal of Baby Rodriguez. Under these circumstances she is entitled to judicial or qualified immunity for any deprivation flowing from that order. LCCYS has a statutory mandate to investigate referrals of child abuse and actions undertaken in furtherance of that mandate that are based on reliable information do not rise to the level of an actionable custom, policy or practice under § 1983. And seeking judicial authorization to protect a potential victim of child abuse under circumstances that require immediate decisions based on the reliable information at hand cannot be said to "shock the conscience" and constitute a Fourteenth Amendment substantive due process violation. Finally, plaintiffs' conspiracy claim assertedly fails because there was no constitutional violation and the timeframes, objects and overt acts of the alleged conspiracy cannot be gleaned from the amended complaint in any event.

Jameson asserts the amended complaint fails to identify a violation of a constitutional right or an agreement or understanding between it and any of the county defendants to violate such a right. Without such an understanding or agreement it could not have acted under color of state law, thereby precluding any § 1983 claim against it. It also enjoys immunity against any claim of negligence under Pennsylvania's Child Protective Services Law and plaintiffs cannot recover for negligent inflection of emotional distress because they did not suffer physical injury.

Plaintiffs contend that while Montague enjoys judicial immunity for petitioning the state court and formulating and making recommendations that were part of that dependency proceeding, they seek recovery based actions taken during the investigative phase leading to the removal of Baby Rodriguez and after her removal. Montague initiated the process to remove Baby Rodriguez without independent investigation into Jameson's report of drug use or the

specific circumstances at hand. She operated without reasonable suspicion of child abuse and solely on a policy presumption that she had reason to question based on past experience and the existing circumstances. The unconstitutional interference with plaintiffs' familial rights continued for two days after Montague realized that the removal was without any foundation. These challenged actions are beyond the scope of any claimed immunity because they precede and postdate the dependency proceeding and involve clearly established rights to be free from interference with fundamental familial rights.

Moreover, plaintiffs contend that (1) the failure to conduct an investigation in order to determine whether reasonable suspicion of child abuse existed and (2) the commencement of a dependency proceeding based solely on a presumption that a positive test result placed the newborn child at imminent risk for exposure to drugs and child abuse were committed pursuant to a custom, policy and practice that has been developed and adopted by LCCYS. Thus, a § 1983 claim properly has been set forth against the County and LCCYS pursuant to Monell v. Dept. of Soc. Servs., New York City, 436 U.S. 658 (1978). And LCCYS' actions pursuant to that policy interfered with well-established fundamental rights and were sufficiently flagrant to shock the conscience.

Finally, plaintiffs maintain that the amended compliant sufficiently sets forth a factual basis to support the §1983 claim against Jameson. LCCYS and Jameson have an ongoing working relationship and worked together to formulate the operative policy. That policy subjects all obstetrical patients to urine drug screenings. Jameson reports any positive test results to LCCYS. The testing and reporting are not required by any law or regulation. LCCYS removes any infant whose mother has tested positive.

The policy itself allegedly serves the goals of LCCYS and does not serve the medical purposes of Jameson. LCCYS relies on Jameson's reports of positive results and commences dependency proceedings without further investigation and based solely on those reports. As part of the developed policy Jameson became aware of LCCYS's practice of removing any newborn whose mother had tested positive. Pursuant to and acting in furtherance of the policy LCCYS and Jameson acted in concert and jointly with each other to remove Baby Rodriguez from plaintiffs' custody and did so without any individualized investigation or reasonable suspicion to believe that Baby Rodriguez had been abused or was in imminent danger of being abused.

Under these circumstances plaintiffs assert that Jameson acted under color of state law. It acted in concert with LCCYS by formulating and implementing an unconstitutional policy to separate newborns without the individualized investigation and reasonable suspicion needed for impingement on the fundamental rights at issue. Jameson acted jointly in the violation when its reporting and assessment automatically became the state's basis for commencement of the dependency proceeding.

In general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right. [2] Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law. Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir.

---

[2] Section 1983 creates liability against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

1997); Berg v. Cty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("The Plaintiff must demonstrate that a person acting under color of law deprived him of a federal right." ) (citing Groman, 47 F.3d at 633).

In any § 1983 claim, "the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5 (1998) (citations omitted). Plaintiffs' allegations involve fundamental rights protected by the Due Process Clause of the Fourteenth Amendment. Lassiter v. Department of Social Services, 452 U.S. 18, 24-32 (1981); Santosky v. Kramer, 455 U.S. 745, 753, 758-68 (1982).

The interest of parents in the care, custody, and control of their children is one of the oldest fundamental liberty interests recognized under the United States Constitution. Troxel v. Granville, 530 U.S. 57, 65 (2000); see also Prince v. Massachusetts, 321 U.S. 158, 166 (1944) ("It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."); Miller v. City of Philadelphia, 174 F.3d 368, 373 (3d Cir. 1999) (natural parents have a fundamental liberty interest in the care, custody, and management of their child) (citing Santosky, 455 U.S. at 753). This interest does not evaporate or dissipate merely because an individual has been less than a model parent. Santosky, 455 U.S. at 753.

Nevertheless, the fundamental liberty interest of natural parents in the care, custody, and management of their children is not absolute. Croft v. Westmoreland County Children and Youth Services, 103 F.3d 1123, 1125 (3d Cir. 1997) (citing Martinez v. Mafchir, 35 F.3d 1486, 1490 (10th Cir. 1994) and Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir. 1987)). "Indeed, this liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children --- particularly where the children need to be protected from their own

parents." Id. (citing Myers, 810 F.2d at 1462). "The right to familial integrity, in other words, does not include a right to remain free from child abuse investigations." Id. (citing Watterson v. Page, 987 F.2d 1, 8 (1st Cir.1993)).

When the state seeks to impinge on familial rights pursuant to allegations of abuse, the rights of the parent "must be balanced against the state's interest in protecting children suspected of being abused." Id. To override the parental interest the state must have "some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." Id. at 1126 (citing Lehr v. Robertson, 463 U.S. 248, 254-56 (1983) (liberty interests in preserving the family unit are "sufficiently vital to merit constitutional protection in appropriate cases") and Myers, 810 F.2d at 1462-63 (parental liberty interest in maintaining integrity of family unit consistently has been "limited by the compelling governmental interest in protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.")). Where such evidence exists, the removal of a child from parental custody does not infringe on the liberty interests at stake even though a later investigation reveals that no abuse occurred. Id. In contrast, taking such action without reasonable suspicion to believe ongoing parental custody presents a threat to the child's health or safety constitutes an arbitrary abuse of government power. Id.

Claims asserting unwarranted intrusion on familial rights by executive officials must satisfy the strict requirements governing liability for substantive due process violations. Miller, 174 F.3d at 374-75. "The touchstone of due process is the protection of the individual against arbitrary action of government." Id. at 374 (citing Wolff v. McDonnell, 418 U.S. 539, 558 (1974)). Where a member of the executive branch is alleged to have engaged in abusive action, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense."

Id. (quoting Lewis, 523 U.S. at 845). To generate liability the conduct "must be so ill-conceived or malicious that it 'shocks the conscience.'" Id. Negligent conduct does not satisfy this standard. Id.

The "shocks the conscience" standard is not self-executing. Id. It nevertheless serves as "the beginning point in asking whether or not the objective character of [the conduct in question] is consistent with our traditions, precedents, and historical understanding of the Constitution and its meaning." Id. (citing Lewis, 523 U.S. at 1722 (Kennedy, J., concurring)).

The degree of wrongfulness needed to satisfy the "conscience-shocking" standard depends upon the circumstances of the particular case. Id. In other words, deliberate indifference or even arbitrary action may rise to the required level in one setting and fall short in another. Id. at 375-76. For example, settings that call for instantaneous and pressured decisions without the ability to consider the risks such as the high speed chase in Lewis demand proof of an intent to harm. Id. at 375. Consideration must be given to the rights involved, the degree of deprivation, the setting in which the action occurred, the time available for the actor to reflect or consider the risks and repercussions of a particular course of action, and so forth. Id.

A social worker seeking to separate parent and child usually does not act in an environment that requires instant decisions under unfolding, unclear or dangerous circumstances. Nevertheless, such workers often do not have the luxury of operating by deliberate action. In such settings a plaintiff need not prove that the social worker acted with the "purpose to cause harm, but the standard of culpability for substantive due process purposes must exceed both negligence and deliberate indifference, and reach a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" Id.

The United States Court of Appeals for the Third Circuit found a social worker's actions to be arbitrary in Croft. There, a social worker threatened to remove a child from the home if the father did not leave. Through this conduct the social worker effectively removed the child from the parents' custody. The social worker did not have specific grounds to believe that the child had been abused or was in imminent danger of being abused. Croft, 103 F.3d at 1126-27. The action was predicated solely on the basis of a sixth-level hearsay statement and the social worker had not personally formed an opinion as to whether abuse was likely. In fact, the social worker subsequently conceded that she had no evidence that supported the potential for abuse beyond the anonymous tip and had no physical evidence upon which to base an opinion. Abridging the parent-child relationship under these circumstances was an arbitrary abuse of government power. Id. at 1127. And taking such action "without any valid basis for doing so" reflected decision-making that was so clearly arbitrary that it "can properly be said to 'shock the conscience' and, therefore, violate[] the substantive due process rights of the affected family [under Lewis]." Miller, 174 F.3d at 376.

Here, plaintiffs have alleged facts that will support the following: (1) Baby Rodriguez was removed pursuant to a policy that solely was predicated on and solely triggered by the report of a single piece of data – a positive UDS; (2) it was known that the cut-off standards used for the testing could and at times did produce false positives from eating certain foods and were well below other reliable cut-off levels that were formulated to account for the consumption of certain common foods and medicines; (3) there was no further investigation or inquiry to the individualized circumstances of the mother or the newborn child; (4) there was no attempt to determine from the mother or other family members with whom she lived whether the single piece of data being relied upon to take the action could be accounted for by other innocent reason

or explanation; (5) there was no attempt to question or inquire with the treating professionals or staff about the potential or likelihood of the use of drugs during pregnancy; and (6) there was no consideration whatsoever of other medical information readily available that suggested the positive UDS was a false positive and not indicative of circumstances that were suggestive of a potential for child abuse. In accordance with the policy, it was only after the mother and child were separated that an individualized assessment was undertaken to determine whether there was evidence to support the potential for child abuse.

Developing and implementing a policy that separates a mother and a newborn child without an individualized assessment of the specific facts and circumstances at hand and proceeds expeditiously and blindly based on a single piece of information that does not supply reasonable suspicion of child endangerment or ongoing abuse when all other information readily available demonstrates the opposite constitutes conduct that is counter to the traditions, precedents and historical understanding of the Constitution and its meaning. Croft, 103 F.3d 1126 (specific and articulable evidence from the circumstances at hand providing reasonable suspicion of child abuse is necessary to separate child and parent and the touchstone to evaluating due process claims of infringement of familial rights) (collecting cases in support); Nicholson v. Williams, 203 F. Supp.2d 153, 237 (E.D. N.Y. 2002) ("The government must be able to show 'an objectively reasonable basis' for deciding the child is immediately threatened with harm to justify removal from the mother without prior judicial authorization. . . . A corollary of this rule is that the government must conduct sufficient investigation into the alleged neglect or abuse it relies upon to establish an objectively reasonable belief that the mother has neglected or abused her child.") (citing Gottlieb v. County of Orange, 84 F.3d 511, 516 (2d Cir.1996)); and Strail v. Dept. of Children, Youth and Families of State of R.I., 62 F. Supp.2d

519, 529 (D. R.I. 1999) ("[T]he due process clause will certainly be offended if children are taken away from their parents without sufficient investigation."); Cf. Stanley, 405 U.S. at 656-657 ("Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child.  It therefore cannot stand.").  Formulating and carrying out such a policy reflects repetitive action that is taken after there has been more than sufficient time to deliberate.  It can result in the separation of mother and child within days of birth without any valid basis for doing so.  Where that happens, the rights involved are fundamental, the deprivation is significant, the government action can be found to be an arbitrary use of government power and the executive action can be said to transcend the realm of negligence and deliberate indifference and reflect conduct that is so clearly arbitrary that it shocks the conscience and therefore violates the substantive due process rights of the affected family.  See Miller, 174 F.3d at 376.

Against this backdrop the County and LCCYS' contention that the allegations of the amended complaint fail to place them within the reach of § 1983 liability is misplaced.  The amended complaint sufficiently alleges enough factual matter to permit the reasonable inference that discovery will reveal evidence to support the necessary elements of relief under a viable theory of recovery.

Whether a municipal entity may be held liable under § 1983 is governed by the doctrine announced in Monell v. New York City Department of Social Services, 436 U.S. 658 (1978).  There, the Supreme Court held that liability against such an entity may not be established by the respondeat superior doctrine, but instead must be founded upon evidence indicating the

government itself supported a violation of the plaintiff's constitutional rights. Id. at 694; see also Bielevicz v. Dubinon, 915 F.3d 845, 849-50 (3d Cir. 1990) (stating "municipal liability attaches only when 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'") (quoting Monell, 436 U.S. at 694).

Proving a government policy or custom can be accomplished in a number of different ways. Bielevicz, 915 F.2d at 850. "Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). Custom, in contrast, can be proven by demonstrating that a given course of conduct, although not specifically endorsed or authorized by state or local law, is so well-settled and permanent as virtually to constitute law. Id. (citing Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir.) ("Custom may be established by proof of knowledge and acquiescence."), cert. denied, 42 U.S. 919 (1989)).

Here, the alleged policy is more than sufficiently identified. Plaintiffs aver that the policy of removing a newborn based solely on a report of the mother testing positive for the presence of an illicit substance was well established and action pursuant to that policy was specifically authorized by LCCYS. Am. Compl. at ¶ 89-93. In deciding to initiate a dependency proceeding to obtain custody of Baby Rodriguez LCCYS followed the policy of separating mothers based solely on a positive test result and then investigating whether the specific circumstance warrant protective placement. Id. These allegations are grounded in sufficient factual content. Mort had received regular prenatal care throughout her pregnancy and there were no test results or other indications from that treatment that suggested drug use. All such tests and treatment only

supported the opposite inference. Mort's treating physician did not have any reason to believe Mort had used illicit drugs during pregnancy and believed the test result was a false positive. Baby Rodriguez had tested negative for exposure to opiates. Mort had a very low level of opiate metabolites in her system which was consistent with consuming certain foods known to produce false positives. Mort had consumed a food known to produce positive test results two hours before going into labor. No one asked Mort or any of her family members about the positive test results, her prior activities during pregnancy, the foods and drinks she consumed shortly before going into labor, the composition of her family household, and so forth. Given this factual background plaintiffs' allegations that LCCYS formulated a policy of separating mother and newborn based solely on a positive test result and then conducting a specific investigation to ascertain whether protective placement was necessary are not mere conclusions or naked assertions devoid of further factual development. Accordingly, taken as a whole and as true, the factual allegations present a claim to relief that is facially plausible, which is all that is required at this juncture.[3]

---

[3] The County defendants' contention that the amended complaint is subject to dismissal because it does not sufficiently identify the timeframes, objects and overt acts of the alleged conspiracy is not supported by law or fact. Heightened specificity pleading is not required in civil rights cases. Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993) (rejecting heightened pleading standard in civil rights cases as inconsistent with Fed. R. Civ. P. 9(b)); Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512-13 (2002) (Rule 8's simplified pleading standard applies to all civil cases with the exceptions for fraud and mistake set forth in Rule 9(b) and "this simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims."). Furthermore, the amended complaint advances factual allegations regarding an existing relationship between LCCYS and Jameson, the policy, the development of the policy prior to the incident in question, the object of the conspiracy, one overt act carried out by all defendants in furtherance of the conspiracy, and the assertion of other similar occurrences undertaken pursuant to the policy based on information and belief. This is more than sufficient to place defendants on notice of the grounds upon which the conspiracy claim rests. The County defendants' reliance on the lack of more detail at this juncture is curious given that such information presumably resides with and is under the control of defendants.

Similarly, Montague's invocation of absolute and qualified immunity is wide of the mark. To the extent a CYS worker is "directly involved in the judicial process, he may receive immunity in his own right for the performance of a discretionary act or he may be covered by the immunity afforded the judge because he is performing a ministerial function at the direction of the judge." Waits v. McGowan, 516 F.2d 203, 206 (3d Cir. 1975). This immunity also covers "their actions in petitioning and in formulating and making recommendations to the state court because those actions are analogous to functions performed by state prosecutors, who were immune from suit at common law." Ernst v. Child and Youth Services of Chester County, 108 F.3d 486, 493 (3d Cir. 1997).

Although immunity is an affirmative defense, "a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense ... appears on its face." ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir.1994); see also 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, at 358–59 (1990) (citing cases). Accordingly, absolute or qualified immunity "will be upheld on a 12(b)(6) motion only when the immunity is established on the face of the complaint." Leveto v. Lapina, 258 F.3d 156, 161 (3d Cir. 2001) (quoting Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir.1996) (citation omitted)); accord Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir.1998) (recognizing entitlement to official immunity on face of complaint); Santamorena v. Georgia Military College, 147 F.3d 1337, 1342 (11th Cir.1998) (recognizing entitlement to qualified immunity on face of complaint).

Here, plaintiffs do not predicate their claim against Montague on petitioning the court for the *ex parte* order to remove Baby Rodriguez, presumably because they recognize that this conduct falls within the scope of the immunity recognized in Waits and Ernst. Instead, they seek

to establish liability based on the decision to initiate the dependency proceeding based solely on the policy and without any individualized or specific investigation or determination that Baby Rodriguez was in danger of child abuse. They also seek to establish liability based on Montague's failure to return Baby Rodriguez for two additional days after she realized that the sole reason for removing the child was without foundation. These allegations identify decisions and actions that are beyond the petitioning and ministerial functions and are predicated on factual assertions that do not establish entitlement to immunity as a matter of law. Consequently, Montague's invocation of absolute immunity fails.

Qualified immunity shields "government officials performing discretionary functions...from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Rogers v. Powell, 120 F.3d 446, 454 (3d Cir. 1997) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "A defendant has the burden to establish that he is entitled to qualified immunity." Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court established a two-part test to determine whether a defendant is entitled to qualified immunity. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If no constitutional right was violated, "the qualified immunity inquiry is at an end; the officer is entitled to immunity." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002). If, however, the facts read in the light most favorable to the plaintiff show a violation of a constitutional right, the analysis proceeds to the second step: "whether the right was clearly established... in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201. A right is clearly established in the particular context if

"it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202. However, if it was not clear "to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity." Kopec, 361 F.3d at 776.

Plaintiffs allege enough factual matter which when taken as true raise the inference that Montague proceeded solely on a policy presumption that she had reason to question based on past experience and the existing circumstances. She acted without reasonable suspicion of child abuse and failed to conduct any individualized investigation. She failed to ask anyone about the specifics of the test results, the family setting, prior medical testing and treatment, prior observations of Mort during pregnancy, and so forth. She failed to ask Mort or any other family member about Mort's activities prior to going into labor. These factual averments and the reasonable inferences therefrom sufficiently state a claim for a constitution violation that is plausible on its face pursuant to the established case law. They allege a course of action that has been recognized as unconstitutional and do not establish an entitlement to qualified immunity that appears on the face of the complaint. It follows that Montague has not met her burden to prove entitlement to qualified immunity.

Jameson's effort to extract itself from liability likewise is unavailing. The amended complaint contains sufficient factual allegations to advance a claim that Jameson acted under color of state law. Plaintiffs predicate their claim on theories of joint action and conspiracy.

The Supreme Court has observed that the criteria for determining the presence of state action lacks rigid simplicity. Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296 (2001). Over the years the Court has established a number of approaches to answer the general question of whether there is a sufficiently "close nexus between the State and

the challenged action [so] that seemingly private behavior may be fairly treated as that of the State itself."  Id.  (quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974)).  It has identified a host of factors that can "bear on the fairness of such an attribution,"  such as when (1) the challenged activity results from the state's exercise of coercive power, (2) the state provides significant encouragement, either overt or covert, or (3) a private party becomes a willful participant in joint activity.  Id. at 296 (collecting cases in support).

In Crissman v. Dover Downs Entertainment Inc., the Third Circuit followed Brentwood's approach to evaluating allegations of state action by private parties.  Crissman, 289 F.3d 231, 239 (3d Cir. 2002).  Regardless of whether the approach is treated as "tests" or "facts," "Brentwood directs courts to focus on the fact-intensive nature of the state action inquiry, mindful of its central purpose: to assure that constitutional standards are invoked 'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.'"[4]  Id. (citing Brentwood, 531 U.S. at 295 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (emphasis in original)).   In other words, the basic question is whether the challenged act can be "fairly attributed to the state."  Crissman, 289 F.3d at 231 (citing American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999)).

Brentwood highlighted Lugar as an example of when private party conduct may be fairly attributed to the state under the theory of joint activity.  Brentwood, 531 U.S. at 295.  Lugar set forth two central principles to guide the fact-intensive inquiry in this area: "[f]irst, the deprivation must be caused by the exercise of some right or privilege created by the State or by a

---

[4] The Supreme Court pointed out in Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982), that it has never been clear "[w]hether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry that confronts the Court in [each] situation." Id. at 939; see also Groman, 47 F.3d at 639 n. 16.  Brentwood appears to embrace the second understanding.  Crissman, 289 F.3d at 239 n. 12.

rule of conduct imposed by the State or by a person for whom the State is responsible" and

"[s]econd the party charged with the deprivation must be a person who may fairly be said to be a

state actor. This may be because he is a state official, because he has acted together with or has

obtained significant aid from state officials, or because his conduct is otherwise chargeable to the

State." Lugar, 457 U.S. at 937.

Although these two principles are related, they are not the same. Id. They "collapse into

each other when the claim of a constitutional deprivation is directed against a party whose

official character is such as to lend the weight of the State to his decisions" and "diverge when

the constitutional claim is directed against a party without such apparent authority, *i.e.* a private

party." Id. (citing Monroe v. Pape, 365 U.S. 167, 172 (1961)). The Court contrasted Moose

Lodge No. 107 v. Irvis, 407 U.S. 163 (1972), with Flagg Brothers Inc. v. Brooks, 436 U.S. 149

(1978), as cases focusing on the separate principles. Lugar, 457 U.S. at 937-39. In Moose

Lodge, the Court determined that Moose Lodge's admittedly discriminatory guest policy was

beyond the reach of the Equal Protection Clause because the governmental decisions made by

Pennsylvania Liquor Control Board that affected Moose Lodge were unconnected to the Lodge's

discriminatory guest policy and therefore the private guest policy could not fairly be ascribed to

a governmental decision. Id. at 938. In Flagg Brothers, the Court held that a warehouse's

prejudgment attachment pursuant to state statute that was challenged on grounds of due process

and equal protection was insufficient to establish state action because of the character of the

defendant's conduct: "[a]ction by a private party pursuant to this statute, without something

more, was not sufficient to justify a characterization of that party as a 'state actor.'" Id. at 938-39

(emphasis in original). It listed several ways in which the "something more" might be satisfied:

the public function test, the state compulsion test, the nexus test and the joint action test.  Id.

(collecting cases).

The Court applied the principles to two separate counts.   One count alleged a deprivation

resulting from the "malicious, wanton and willful" action that was "unlawful" under state law.  In

explaining the inadequacy of such a claim the Court opined:

> To say this, however, is to say that the conduct of which petitioner complained
> could not be ascribed to any governmental decision; rather, respondents were
> acting contrary to the relevant policy articulated by the State.  Nor did they have
> the authority of state officials to put the weight of the State behind their private
> decision, i.e., this case does not fall within the abuse of authority doctrine
> recognized in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

Id.  It further explained: "That respondents invoked the statute without the grounds to do so

could in no way be attributed to a state rule or a state decision. Count two, therefore, does not

state a cause of action under § 1983 but challenges only private action."  Id.

Count one challenged the procedure utilized by the respondent to obtain prejudgment

attachment of the petitioner's property.  The attachment was dismissed after the state court

determined that the respondent had failed to meet its burden under state law.  Petitioner

contended the statutory scheme as procedurally defective under the Fourteenth Amendment.  Id.

at 940-41.  In assessing the validity of this count the Court observed:

> While private misuse of a state statute does not describe conduct that can
> be attributed to the State, the procedural scheme created by the statute obviously
> is the product of state action. This is subject to constitutional restraints and
> properly may be addressed in a § 1983 action, if the second element of the state-
> action requirement is met as well.

> As is clear from the discussion in Part II, we have consistently held that a
> private party's joint participation with state officials in the seizure of disputed
> property is sufficient to characterize that party as a "state actor" for purposes of
> the Fourteenth Amendment. The rule in these cases is the same as that articulated
> in Adickes v. S. H. Kress & Co., supra, 398 U.S., at 152, 90 S. Ct., at 1605–1606,
> in the context of an equal protection deprivation:

25

> " 'Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents,' " quoting <u>United States v. Price</u>, 383 U.S., at 794, 86 S. Ct., at 1157.

<u>Id.</u> at 941.  "The Court of Appeals erred in holding that in this context 'joint participation' required something more than invoking the aid of state officials to take advantage of state-created attachment procedures."  <u>Id.</u> at 942.  The joint participation requirement was sufficiently alleged because the scheme created by the state "created a system whereby state officials will attach property on the ex parte application of one party to a private dispute."  <u>Id.</u>

Under <u>Lugar</u>, if the alleged misconduct arises from a violation of a state statute or scheme that is valid, improper or unlawful invocation/utilization of the scheme is not enough to make the private party a state actor.  <u>Benn v. Universal Health System, Inc</u>, 371 F.3d 165, 172 (3d Cir. 2004) (A private party's invocation of a statute without grounds to do so cannot "be attributed to a state rule or decision.").  This principle extends to private parties that defectively or deficiently perform a prerequisite duty or obligation mandated by or under a state statute or scheme.  <u>Id.</u> (claim that private mental health care providers who performed a "seriously defective evaluation process" leading to the plaintiff's commitment under Pennsylvania's Mental Health Procedures Act was "precisely the type of claim that <u>Lugar</u> found to be inadequate to establish state action."  <u>Id.</u>

In contrast, allegations of joint participation in carrying out a state statute or scheme that is itself constitutionally defective states a claim for a due process deprivation.  <u>Lugar</u>, 457 U.S. at 942; <u>accord</u> <u>Cruz v. Donnelly</u>, 727 F.2d 79, 82 (3d Cir. 1984) ("at least when the state creates a system permitting private parties to substitute their judgment for that of a state official or body, a private actor's mere invocation of state power renders that [private] party's conduct actionable

[as a joint actor with the state] under § 1983."). In such cases the actions of the private party become those of the state and the unconstitutional character of the action is created by the state, thereby creating "such a close nexus between the state and the challenged action that seemingly private behavior may be fairly treated as that of the state itself." Brentwood, 531 U.S. at 295.

Conspiratorial conduct likewise can satisfy the two principles highlighted in Lugar. Lugar, 457 U.S. at 931. In Adickes, the Court recognized that a "private party's joint participation with a state official in a conspiracy to discriminate would constitute both 'state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights' and action 'under color' of law for purposes of [ § 1983]." Id. (quoting Adickes, 398 U.S. at 152); accord Dennis v. Sparks, 449 U.S. 24, 27 (1980) ("[a]lthough not an agent of the state, a private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts 'under color of state law' for purposes of § 1983." ). In this setting the first principle may be satisfied by the state official joining with the party to carry out a state procedure for a constitutionally prohibited reason. Adikes, 398 U.S. 152 ("Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in The Kress store, or to cause her subsequent arrest because she was a white person in the company of Negroes."); accord Dennis, 449 U.S. at 31-32 (allegations that an official act by a state court judge was the product of a corruption conspiracy involving bribery of the judge were sufficient to assert action under color of state law on the part of the private parties); Abbott v. Latshaw, 164 F.3d 141, 198 (3d Cir. 1998) (allegations that ex-wife formed

agreement with state constable to repossess vehicle without affording ex-husband advance notice and an opportunity to be heard prior to the seizure and effectuated that agreement with aid of constable and local police officer stated § 1983 claim against ex-wife).

Alternatively, action under color of law may be found when a private party "has been delegated ... a power 'traditionally exclusively reserved to the State.'" <u>McKeesport Hosp. v. Accreditation Council for Graduate Medical Educ.</u>, 24 F.3d 519, 524 (3d Cir. 1994) (quoting <u>Flagg Brothers</u>, 436 U.S. at 157). Recognition of private party state action under this "public function" doctrine traditionally has been confined to functions that have been "exclusively reserved to the state" such as the conducting of elections or the performance of actual government functions. <u>Flagg Brothers</u>, 436 U.S. at 158-59.

Plaintiffs' claim against Jameson is predicated on the assertions that it worked and formed an understanding with LCCYS to create and implement the policy to perform a UDS on all obstetrical patients receiving services at the hospital and report all positive results to LCCYS so that it can investigate for drug use and the potential for child abuse. In the case of patients admitted for delivery who test positive the established custom is to remove the newborn after birth and then investigate the specific circumstances at hand. Jameson is alleged to have (1) worked closely with LCCYS in establishing the state scheme and (2) played an integral role in testing and reporting under the scheme, knowing that LCCYS would undertake no further investigation prior to removing the newborn from its mother. In accordance with the established policy and practice it allegedly did not relay any additional information available that might be needed to understand or interpret the test results or recognize that further investigation was warranted before deciding on a course of action.

Plaintiffs' § 1983 claim is based on the contention that the scheme is itself unconstitutional because it dispenses with an individualized assessment of the attendant circumstances and effectuates an infringement on familial rights without reasonable and articulable evidence giving rise to reasonable suspicion that a child has been abused or is in imminent danger of abuse. Jameson conveyed the positive UDS results to LCCYS and through the actions of Montague it removed Baby Rodriguez in accordance with the scheme.

Under these circumstances the first principle in <u>Lugar</u> is satisfied because the alleged infringement assertedly was effectuated by the acts of a government official. The second principle likewise is present because the scheme is alleged to be unconstitutional in itself and Jameson is alleged to have both formed an agreement with LYCYS to create and implement it and been a joint participant in implementing it in the instance at hand. The amended complaint contains sufficient factual content to create a reasonably founded hope that the discovery process will reveal relevant evidence to support both of these principles. Consequently, Jameson's motion to dismiss the § 1983 claim must be denied.

Jameson's motion to dismiss the negligence claim stands on different footing. Mort identifies the numerous duties noted above that allegedly were breached by Jameson's negligence and asserts that these breaches caused her to "suffer harm, including but not limited to, emotional and psychological pain and suffering and injury to her reputation." Am. Compl. at ¶ 113.

Negligent infliction of emotional distress is a cognizable tort in Pennsylvania. <u>See</u> <u>Sinn v. Burd</u>, 404 A.2d 672 (Pa. 1979); <u>Niederman v. Brodsky</u>, 261 A.2d 84 (Pa. 1970). Nevertheless, the circumstances under which one may recover remain less than clear. <u>See</u> <u>Marchese v. Umstead</u>, 110 F. Supp.2d 361, 368-69 (E.D. Pa. 2000) (observing uncertainty in reach of tort under Pennsylvania law); <u>Brown v. Philadelphia College of Osteopathic Med.</u>, 674

A.2d 1130, 1135 (Pa. Super. 1996) (same); Regan v. Township of Lower Merion, 36 F. Supp.2d 245, 252 (E.D. Pa. 1999) (same).

"The tort has evolved largely in the context of those who observe an injury occurring to close family members and are distressed as a consequence of the shock." Marchese, 110 F. Supp.2d at 368 (citing Armstrong v. Paoli Memorial Hosp., 633 A.2d 605, 609 (Pa. Super. 1993), allocatur denied, 649 A.2d 666 (Pa. 1994)). Even in this setting Pennsylvania courts routinely require an averment of physical injury to sustain a cause of action for negligent infliction of emotional distress. Id. (citing Brown, 674 A.2d at 1135 and Hunger v. Grand Cent. Sanitation, 670 A.2d 173, 178 (Pa. Super. 1995)). Some courts have limited the tort to situations where a close family member experiences a contemporaneous sensory observance of physical injuries being inflicted on another family member or the plaintiff nearly experiences a physical impact as a result of being within the zone of danger of the defendant's tortious conduct. See, e.g., Hunger, 670 A.2d at 178. These courts also have limited the scope of the tort to situations where the defendant's tortious conduct has caused some form of physical injury. See id. ("A plaintiff cannot recover for emotional upset where there is no physical impact involved in the case at all." ). Others have held that the claim can be advanced beyond these limitations where the defendant breached "a distinct pre-existing duty of care" such as a contract or fiduciary duty. Marchese, 110 F. Supp.2d at 369 (collecting cases). Merely alleging a violation of one's civil rights falls short of supplying any of these prerequisites. Id. (Stating claim for conspiring to violate plaintiff's § 1983 rights in violation of Equal Protection Clause does not provide basis for breach of independent duty.); Regan, 36 F. Supp.2d at 252 (Improperly terminating employee in violation of Title VII does not constitute breach of independent duty.).

Here, plaintiffs have not set forth allegations that fall within the perimeter of the recognized tort. They have failed to allege any physical impact or injury from Jameson's tortious conduct. Nor have they asserted that they witnessed a severe physical injury or trauma to a close family member and suffered concrete manifestations of distress as a consequence of that shock. They have not alleged that Jameson owed them an independent duty. Thus, without any physical impact, the witnessing of severe physical trauma to a close family member and concrete manifestations of emotional distress or an independent duty, plaintiffs have failed to advance a showing of relief that is plausible under a cognizable theory of recovery.[5]

---

[5] Plaintiffs' contention that they can plead physical manifestations of emotional distress and/or discovery may reveal evidence that reflects forms of physical manifestation produced by their emotional trauma is unavailing. The scenarios where a claim for negligent infliction of emotional distress has been recognized in the absence of physical impact are very limited. The Supreme Court of Pennsylvania has permitted a parent to recover for mental distress caused by the birth of an unplanned, genetically defective child in Speck v. Finegold, 439 A.2d 110 (Pa. 1981). It upheld the recovery of a parent who witnessed tortious assault upon her minor child in Sinn v. Burd, 404 A.2d 672 (Pa. 1979). And it permitted a woman to recover who had been wrongfully imprisoned because of misleading advise given by the tax bureau in Little v. York County Earned Income Tax Bureau, 481 A.2d 1194 (Pa. 1984).

In Little, the court relied on Restatement (Second) of Torts § 905(b) and Comment (d) to support its decision in answering what it found to be "a unique question." Id. at 1201-02. It thus analogized the situation to one involving an intentional form of tortious conduct. In that setting Section 46 of the Restatement (Second) of Torts provides authority for the recovery of severe emotional distress where there has been "outrageous conduct." Comment (l) to that section is illuminating. It provides:

> Where the extreme and outrageous conduct is directed at a third person, as where, for example, a husband is murdered in the presence of his wife, the actor may know that it is substantially certain, or at least highly probable, that it will cause severe emotional distress to the plaintiff. In such cases the rule of this Section applies. The cases thus far decided, however, have limited such liability to plaintiffs who were present at the time, as distinguished from those who discover later what has occurred. The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually unlimited, and the distress of a woman who is informed of her husband's murder ten years afterward may lack the guarantee of genuineness which her presence on the spot would afford.

For the reasons set forth above, the County defendants' motion to dismiss will be denied and Jameson's motion to dismiss will be granted as to counts three and four and denied in all other aspects. An appropriate order will follow.

Date: August 31, 2011

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Antoinette C. Oliver, Esquire
        Patricia L. Dodge, Esquire
        Quinn A. Johnson, Esquire
        Sara Rose, Esquire
        Marie Milie Jones, Esquire
        Jeffrey Cohen, Esquire
        John C. Conti, Esquire
        Richard J. Kabbert, Esquire

        Via: CM/ECF Electronic Mail

---

Restatement (Second) of Torts § 46, comment l.

The "presence" requirement of Section 46(2) corresponds to the physical injury requirement. It also corresponds to the observation of physical injury requirement, where the "critical element for establishing such liability is the contemporaneous observation of the injury to the close relative." Mazzagatti v. Everingham, 516 A.2d 672, 679 (Pa. 1986). Such a limitation assures that the tort (1) is not extended beyond the recovery for emotional distress that accompanies the impact of observing an accident scene and (2) does not overlap or blur the traditional boundaries of recovery for emotional distress and anguish that is foreseeable with the invasion of the plaintiff's rights. Id. The later merely reflects the type of distress or mental anguish that would be expected to flow from the defendant's conduct. See id. ("Where, as here, the plaintiff has no contemporaneous sensory perception of the injury, the emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions.").

Plaintiffs claim does not arise in a setting where they were forced to endure emotional distress that sufficiently is distinct from the invasion of their own rights. Consequently, the record does not supply exceptional circumstances that would warrant an extension of the tort.